POMERANTZ LLP
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATLYN STEELE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NANO-X IMAGING LTD., EREZ MELTZER, and RAN DANIEL,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Katlyn Steele ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public

1

documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nano-X Imaging Ltd. ("Nano-X", "Nanox", or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Nano-X securities between March 31, 2025 and April 17, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Nano-X, together with its subsidiaries, develops a commercial-grade tomographic imaging device with a digital X-ray source.  The Company also provides teleradiology services and develops artificial intelligence ("AI") applications for medical imaging applications.

2

3.      Nano-X produces components for its X-ray product at self-owned and third-party manufacturing facilities.  During the Class Period, this included, *inter alia*, micro-electro-mechanical systems ("MEMs") X-ray chips and tubes manufactured at a self-owned facility in the Republic of Korea ("South Korea").

4.      At all relevant times, Defendants touted purported improvements to Nano-X's operations, including efforts to scale up its manufacturing and production operations to meet anticipated demand for its products following regulatory approvals in various localities.   Defendants assured investors that such improvements would drive increased profitability and reduce costs, while touting various new distribution and supply agreements, creating the overall impression that the Company was successfully and efficiently scaling its operations to meet increased demand.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants overstated purported efficiency gains achieved in Nano-X's operations, as well as the purported increased demand for its products; (ii) in reality, Nano-X's production and manufacturing operations were poorly aligned with demand for the Company's products; (iii) as a result, Nano-X was experiencing significantly increased operating expenses and cash burn; (iv) the foregoing

significantly increased the likelihood that Nano-X would be forced to take disruptive remedial measures with respect to its manufacturing operations, entailing significant restructuring and impairment charges; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.     The truth began to emerge on April 20, 2026, when Nano-X issued a press release announcing its fourth quarter ("Q4") 2025 financial results and business updates.  Therein, Nano-X reported, *inter alia*, a Q4 net loss of $33.4 million, mainly due to a $17.5 million charge attributed to impairment of long-lived assets following a restructuring initiative at its Korean chip manufacturing facility. In explaining the restructuring charge, the press release acknowledged that Nano-X needed to "shift[] to a more efficient outsourced production model that is better aligned with current and anticipated demand."  The same press release also announced that Nano-X's then-Chief Financial Officer ("CFO"), Defendant Ran Daniel ("Daniel"), would step down as CFO, effective July 31, 2026.

7.     The same day, during a related earnings call to discuss these results, Nano-X's Chief Executive Officer ("CEO"), Defendant Erez Meltzer ("Meltzer"), likewise disclosed that Defendants needed "to reduce our Korean operation's OpEx [operating expenses] and cash burn and improve efficiency", while reiterating the need to "transition to a more efficient outsourced production model better aligned with current and projected demand."

4

8.    Following the foregoing disclosures, Nano-X's stock price fell $0.695 per share, or 24.39%, to close at $2.155 per share on April 20, 2026.

9.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Nano-X's most recent annual report on Form 20-F, as of December 31, 2025, there were 69,590,228 of the Company's ordinary shares outstanding.  Nano-X's ordinary shares trade in the U.S. on the Nasdaq Stock Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Nano-X's securities located in the U.S., some of whom undoubtedly reside in this District.

13.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

5

including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.    Plaintiff, as set forth in the attached Certification, acquired Nano-X securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.    Defendant Nano-X is organized under the laws of the State of Israel ("Israel") with principal executive offices located at Ofer Tech Park, 94 Shlomo Shmeltzer Road, Petach Tikva, Israel 4970602.  The Company's ordinary shares trade in an efficient market on the NASDAQ under the ticker symbol "NNOX".

16.    Defendant Meltzer has served as Nano-X's CEO at all relevant times. Defendant Meltzer also currently serves as the Company's Acting Chairman.

17.    Defendant Daniel served as Nano-X's CFO at all relevant times.

18.    Defendants Meltzer and Daniel are collectively referred to herein as the "Individual Defendants".

19.    The Individual Defendants possessed the power and authority to control the contents of Nano-X's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Nano-X's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

to cause them to be corrected. Because of their positions with Nano-X, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.    Nano-X and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

21.    Nano-X, together with its subsidiaries, develops a commercial-grade tomographic imaging device with a digital X-ray source, referred to as the "Nanox.ARC". The Company also provides teleradiology services and develops AI applications for medical imaging applications.

22.    Nano-X produces components for the Nanox.ARC at self-owned and third-party manufacturing facilities. During the Class Period, this included, *inter alia*, MEMs X-ray chips and tubes manufactured at a self-owned facility in South Korea.

23.    At all relevant times, Defendants touted purported improvements to Nano-X's operations, including efforts to scale up its manufacturing and production

operations to meet anticipated demand for its products following regulatory approvals in various localities. Defendants assured investors that such improvements would drive increased profitability and reduce costs, while touting various new distribution and supply agreements, creating the overall impression that the Company was successfully and efficiently scaling its operations to meet increased demand.

**Materially False and Misleading Statements Issued During the Class Period**

24.    The Class Period begins on March 31, 2025, when Nano-X issued a press release during pre-market hours announcing its Q4 2024 financial results and business updates. The press release quoted Defendant Meltzer as touting Nano-X's "accelerated . . . US commercialization effort", "operational progress in 2024, coupled with a growing and innovative portfolio," and "confiden[ce] that we are well-positioned to build our momentum and drive our new technologies into a medical imaging market that is ripe for new tools[.]"

25.    The press release also attested to the value of Nano-X's manufacturing operations, stating, in relevant part, that "[a]s of December 31, 2024 the Company had property and equipment of $45.4 million, compared to $42.3 million as of December 31, 2023."

26.    Also on March 31, 2025, during pre-market hours, Nano-X hosted a conference call with investors and analysts to discuss its Q4 2024 results. During

the call, Defendant Meltzer touted growing demand for the Company's products, stating, *inter alia*, that "expansion is crucial to support our growing customer base", that "[o]ur Nanox.ARC pipeline remains robust, and we are currently targeting a few hundreds of clients", that "[w]e see a lot of interest from prospective and current customers and professional healthcare facilities", that "we have a growing base of early adapters that have ordered and are using the ARC", and that "we have seen an increase in the number of referrals, scans, and additional use case."

27.    On the same call, Defendant Meltzer represented that Nano-X's "strategic approach to . . . commercial rollout, including targeted installations and phased scaling, ***underscore a disciplined path to sustainable growth***."[1]

28.    Indeed, in response to an analyst's question regarding Nano-X's manufacturing sites for chips and other components, particularly whether there "has there been any material change on any of those channels in the past quarter", Defendant Meltzer stated:

> ***No*** . . . . Both manufacturing facilities, ***the Nano-X in Korea*** and the system in Switzerland are both manufacturing the chips and ***we are building that***. And we are working right now, while ***we do the scale in the manufacturing facility and the future manufacturing of the ARC.X to have the low cost manufacturing facility*** in addition to the one that we have in Israel.

---

[1] All emphases herein are added unless otherwise indicated.

29. In response to another analyst's question during the call regarding whether "there [is] anything unique in the OpEx that we should factor into 2025 or maintain similar trends", Defendant Daniel stated:

*Not really*, but don't forget that some of our labor costs and other overhead is actually linked to the Israeli shekels and the sum of it a little bit to the Korean currency. *So in terms of any kind of impact on the OpEx, it's only going to be some kind of sharp fluctuations with those currencies. Other than this, everything is in line.* You can see that our G&A [general and administrative] are more so in the range in the past two years. *It's actually decreasing with the completion of the SEC and the class section lawsuit last year. So it's more of the same of the same.*

30. On April 9, 2025, Nano-X filed an annual report on Form 20-F with the SEC, reporting its financial and operating results for the Q4 and year ended December 31, 2024 (the "2024 20-F"). The 2024 20-F stated, *inter alia*, that "[w]e have optimized the MEMs proprietary manufacturing process", "commenced manufacture of the MEMs X-ray chips at our fabrication facility in Korea, which is expected to meet our currently anticipated manufacturing needs", and "secure[d] additional chip supply in anticipation of commercialization scale up and acceleration of manufacturing activity[.]"

31. With respect to impairment of long-lived assets, the 2024 20-F stated, in relevant part:

Our long-lived assets, such as property, plant and equipment, operating lease right-of-use asset and identifiable intangible assets, are reviewed for potential impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.

10

* * *

An impairment charge in the amount of $0.2 million was recorded for the year ended December 31, 2022, in relation to our Property, Plant and Equipment.

***During 2024, 2023 and 2022, we did not record any impairment charge related to our definite life intangible assets.***

32.     Appended as exhibits to the 2024 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that the 2024 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

33.     On May 22, 2025, Nano-X issued a press release announcing its first quarter ("Q1") 2025 financial results and business updates.  The press release quoted Defendant Meltzer as stating, in relevant part:

Since the beginning of 2025, Nanox has made consistent progress marketing our full end-to-end imaging solutions . . . . Our teleradiology business is generating steady revenue which helps to fund our growth . . . . Our top commercial priority is to accelerate the deployment of the Nanox technologies, and to that end we continue to sign collaboration agreements with medical imaging and AI companies to market the Nanox.ARC and Nanox.AI solutions.

11

34.     The press release also attested to the value of Nano-X's manufacturing operations, stating, in relevant part, that "[a]s of March 31, 2025 the Company had property and equipment of $45.3 million, compared to $45.4 million as of December 31, 2024."

35.     Also on May 22, 2025, Nano-X hosted a conference call with investors and analysts to discuss its Q1 2025 results.  During the call, Defendant Meltzer touted growing demand for the Company's products, stating, *inter alia*:

> We've seen an increase in the number of scans performed by our systems, both in the US and worldwide, and we're beginning to see initial revenue streams for Nanox.ARC customers reflecting that we are gaining traction with our Nanox.ARC systems and customers can see the value in using the system.
>
> Our sales pipeline has doubled since January 2025 and our sales team as of today's call is handling over 1,000 leads. Our growing pipeline primarily consists of standalone multi-specialty small and medium-sized health clinics, not only from the US, but also from countries around the world such as Peru, France, Azerbaijan, Hungary, and Poland, and various countries in the EU. Since its commercial deployment at the beginning of this year, there are now over 60 units that are in various stages of implementation and execution of the deployment plan for commercial, demo, and clinical use.
>
> For the operational units, we are achieving an average target of seven scans per day. As we grow, we intend to share more information as our business evolves, and with a promise previously made to provide more details, we will do so today. We are targeting over 100 ARC systems in various stages of deployment by the end of 2025 worldwide. We are happy to now be in a position to share guidance on our commercial progress.

36.    Defendant Meltzer also represented during the call that "[w]e have made progress . . . with what we call the cost of the product", and "what this quarter actually shows, first of all, [is] that we are delivering what we promised, [and] second, we are making progress all the time."

37.    On August 12, 2025, Nano-X issued a press release announcing its second quarter ("Q2") 2025 financial results and business updates.  The press release quoted an unidentified individual, presumably Defendant Meltzer, as stating, in relevant part

> Nanox has made progress advancing the deployment of the Nanox.ARC system in the second quarter, and we are on track to meet our yearly deployment target with revenues expected in the second half of 2025. ***We're seeing a growing and increasingly robust commercial pipeline***, and we're proud to mark a breakthrough in the European market, with the first system ready for shipment . . . . I am proud of our team's diligent execution of our multi-faceted growth strategy[.]

38.    The press release also attested to the value of Nano-X's manufacturing operations, stating, in relevant part, that "[a]s of June 30, 2025 the Company had property and equipment of $46.1 million, compared to $45.4 million as of December 31, 2024."

39.    Also on August 12, 2025, Nano-X hosted a conference call with investors and analysts to discuss its Q2 2025 results.  During the call, Defendant Meltzer stated, *inter alia*, that "[a]s we enter the second half of 2025, the entire Nanox team remains focused on disciplined execution and expanding our

commercial footprint across our entire ecosystem," and that "*[w]e are seeing a growing and increasingly robust manufacturing pipeline*," while touting the purported "*diligent execution* of [the Company's] multifaceted growth strategy."

40. During the same call, an analyst asked whether there are "[a]ny trends we should expect" with respect to operating expenses, noting that "it's been pretty consistent around that kind of $11 million to $12 million a quarter range", and whether investors "[s]hould . . . expect that to continue going forward?" Defendant Daniel responded as follows:

> *Yes.* So with regards to the OpEx itself, you see there *it's correct that it's maintaining the same level in the past few quarters, and that comes from more efficiencies and more measurements that we do to maintain the level of the expenses and to keep our brand to the minimum*.
>
> On the other hand, you see an increase of our sales and marketing expenses as a result of the deployment in the U.S. market and the increase in our sales and marketing activities.
>
> All in all, we -- it's a trade-off. Once we increase in one place, we do decrease in one place, and we're trying to maintain the same level of expenses. And as we have said before and in the past, once you see, especially in the second half of this year and going forward, when you're going to see the revenue alleviating, *then you should see a decrease in the operating loss and the [cash] burn*, et cetera.

41. On November 20, 2025, Nano-X issued a press release announcing its third quarter ("Q3") 2025 financial results and business updates. The press release quoted Defendant Meltzer as stating, in relevant part:

14

*We made a significant progress across our three strategic growth pillars in the third quarter.* These pillars focus on advancing Nanox technologies and market expansion, continuing to build out our AI infrastructure, and *doing all of this with improved operational efficiency* . . . . During the quarter, we entered into multiple collaborations around the world to advance commercialization of both the Nanox.ARC and AI solutions . . . . Our organization is focused on execution and *is well-positioned to build on our momentum in the coming years*.

42.   The press release also attested to the value of Nano-X's manufacturing operations, stating, in relevant part, that "[a]s of September, 30, 2025 the Company had property and equipment of $46.8 million, compared to $45.4 million as of December 31, 2024."

43.   Also on November 20, 2025, Nano-X hosted a conference call with investors and analysts to discuss its Q3 2025 results.  During the call, Defendant Meltzer stated that Q3 2025 "brought progress across the organization, including our technology expansion, market scaling, . . . *and operational efficiency*", and that "we are demonstrating real momentum in moving from innovation to commercial scale with measurable results."

44.   With further regard to Nano-X's purported operational improvements, including purported improvements in its manufacturing operations, Defendant Meltzer stated, *inter alia*:

Now for an update on our third strategic pillar, *which focus on operational efficiency and sustainable growth. We are building a leaner, more focused organization to support long-term success* . . . . [W]e are strengthening our production capabilities through our

15

partnership with Fabrinet preparing to manufacture hundreds of systems. And in parallel, we continue to enhance our tube manufacturing infrastructure as well. ***Nanox remain[s] dedicated to accelerating and development of a highly efficient manufacturing operation.***

\* \* \*

***Looking ahead, Nanox is dedicated to accelerating the development of a highly efficient and scalable manufacturing infrastructure.*** We will always be looking for ways to extract more efficiencies and may include future strategic collaborations.

While making the foregoing statements regarding Nano-X's focus on "develop[ing] . . . a highly efficient manufacturing operation", Defendant Meltzer notably failed to disclose any disconnect between Nano-X's manufacturing operations and demand for its products, much less any contemplated restructuring initiative or impairment charges that would result from such an initiative, despite repeatedly representing during the call that "it is the right time to share our growth road map."

45.    Indeed, during the same call, Defendant Meltzer touted "the rising demand for [the] Nanox Imaging ecosystem and [its] strengthen[ed] . . . presence across Europe."

46.    Also during the call, in response to an analyst's question regarding "how OpEx could look over the next 4 to 6 quarters", Defendant Daniel merely stated:

Generally saying, what you would expect to see is that our investment in the deployment efforts, namely the sales and marketing expenses will

16

increase, of course. [*sic*] because we need to invest in all the activities with -- that are related to the deployment of the systems and the sales.

On the other hand, you should see more [ maintained ] R&D expenses as the focus is going towards commercialization and less on development activities. And we are trying our best to be more, as you know, to be as efficient as we can be, and you should see the same level of G&A with some fluctuations.

Don't forget that a major portion of our G&A expenses are related to us being a public company. And sometimes those expenses increase.

47.    The statements referenced in ¶¶ 24-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants overstated purported efficiency gains achieved in Nano-X's operations, as well as the purported increased demand for its products; (ii) in reality, Nano-X's production and manufacturing operations were poorly aligned with demand for the Company's products; (iii) as a result, Nano-X was experiencing significantly increased operating expenses and cash burn; (iv) the foregoing significantly increased the likelihood that Nano-X would be forced to take disruptive remedial measures with respect to its manufacturing operations, entailing significant restructuring and impairment charges; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

17

48.    Additionally, throughout the Class Period, Nano-X's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.    Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Nano-X to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants' failure to disclose, *inter alia*, that Nano-X's production and manufacturing operations were poorly aligned with demand and, as a result, Nano-X was experiencing significantly increased operating expenses and cash burn, violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

49.    Likewise, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Nano-X to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."    Defendants' failure to disclose, *inter alia*, the issues described in ¶ 48, *supra*, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

18

50.    With its stock price artificially inflated by the foregoing false and/or misleading statements and omissions, on November 23, 2025, Nano-X issued a press release announcing its "ent[ry] into a securities purchase agreement with a single institutional investor for the purchase and sale of 3,826,530 ordinary shares . . . in a registered direct offering" (the "November 2025 Offering").  The November 2025 Offering closed on November 25, 2025, and Nano-X reaped $15 million in gross proceeds as a result.

### The Truth Begins to Emerge

51.    The truth began to emerge on April 20, 2026, when, during pre-market hours, Nano-X issued a press release announcing its Q4 2025 financial results and business updates.  Therein, Nano-X reported, *inter alia*, a Q4 net loss of $33.4 million, mainly due to a $17.5 million charge attributed to impairment of long-lived assets following a restructuring initiative at its Korean chip manufacturing facility. In explaining the restructuring charge, the press release acknowledged that Nano-X needed to "shift[] to a more efficient outsourced production model that is better aligned with current and anticipated demand."  Specifically, the press release stated, in relevant part:

> For the three months ended December 31, 2025 (the "reported period"), ***the Company reported a net loss of $33.4 million***, compared to a net loss of $14.1 million for the three months ended December 31, 2024 (which is referred as the "comparable period"), ***representing an increase of $19.3 million. The increase was largely due to an impairment of long-lived assets in the amount of $17.5 million which***

*was recorded during the reported period in relation to the Company's restructuring of operations at Nanox' [sic] Korean facility that is intended to better align the Company's manufacturing cost structure and support gross margin improvement to the Company's target financial model.*

\* \* \*

As part of this plan and the Company's broader cost reduction efforts, the Company is restructuring its manufacturing footprint to improve gross margins, reduce capital expenditures, and enhance operational efficiency. ***This includes transitioning away from certain manufacturing activities at its facility in South Korea, staring in the fourth quarter of 2025, and moving from a company-owned manufacturing model to a more fully outsourced approach.***

\* \* \*

***As part of the restructuring, the Company will close its chip manufacturing line in South Korea, downsize its fabrication facilities, and transfer certain production activities to third-party international manufacturing partners*** . . . . Following these changes, the Company intends to focus its operations in South Korea on research and development (R&D) and tube production activities that support the Nanox.ARC platform. The restructuring is expected to be substantially completed during fiscal year 2026.

***In connection with the restructuring, the Company expects to incur total restructuring and related charges of approximately $18.0 million, consisting primarily of costs related to the impairment of machinery and equipment associated with the Company's chip manufacturing line.***

52.    The same press release also announced that Defendant Daniel would step down from his role as Nano-X's CFO, effective July 31, 2026.

53.    Also on April 20, 2026, during pre-market hours, Nano-X hosted a conference call with investors and analysts to discuss its Q4 2025 results.  During

the call, Defendant Meltzer provided additional color regarding the restructuring initiative at Nano-X's Korean chip manufacturing facility, disclosing that Defendants needed "to reduce our Korean operation's OpEx and cash burn and improve efficiency", while reiterating the need to "transition to a more efficient outsourced production model better aligned with current and projected demand."

54.    The market reacted swiftly and severely to the foregoing disclosures. As reported the same morning by investor news outlet *Seeking Alpha*, in an article entitled "Nano-X falls after Q4 miss, CFO transition", "[s]hares of Nano-X Imaging (NNOX) lost ~17% on Monday, *on track to what could be its worst intraday decline in over two years* after the Israeli MedTech reported lower-than-expected Q4 2025 results alongside a change in the company's CFO position."  The same article noted the Company's "net loss for Q4", which "*surged ~137% YoY [year-over-year] to $33.4M, mainly due to a $17.5M charge attributed to impairment of long-lived assets following a restructuring initiative at its Korean chip manufacturing facility*."

55.    Ultimately, Nano-X's stock price fell $0.695 per share, or 24.39%, to close at $2.155 per share on April 20, 2026.

56.    The following day, investment banking and research firm Ladenburg Thalmann & Co. Inc. lowered its price target on Nano-X's shares to $9.60 from $10.60 "[b]ased on the company's commentary," noting, *inter alia*, the Company's

21

"approximately $17.5 million of long-lived asset impairment associated with the restructuring of [it]s manufacturing facility in South Korea" and "replace[ment of Defendant] Daniel as CFO effective August 1, 2026."

57.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

58.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Nano-X's securities, Defendants sold millions of the Company's ordinary shares via the November 2025 Offering, reaping $15 million in gross proceeds.

59.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Indeed, at all relevant times, Defendants were highly focused on driving efficiencies in Nano-X's operations and manufacturing processes to improve the Company's profitability and reduce costs, as exhibited by their repeated, highly specific statements regarding these efforts in earnings releases and investor conference calls throughout the Class Period, as alleged *supra*.  Accordingly, during the Class Period, Defendants were undoubtedly aware that Nano-X's production and

22

manufacturing operations were poorly aligned with demand and unsustainable, and that the Company was experiencing significantly increased operating expenses and cash burn as a result. Defendants were thus likewise undoubtedly aware of the need to curtail and/or exit certain of Nano-X's manufacturing operations, switch to a more efficient outsourced production model, and that the Company was likely to incur significant restructuring and impairment charges as result. Simultaneously, however, Defendants consistently touted efficiencies in the Company's operations and manufacturing processes, while omitting the foregoing material negative information concerning Nano-X's business and operations. Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Nano-X securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families

23

and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

61.  The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nano-X securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nano-X or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

62.  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

63.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

64. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nano-X;

- whether the Individual Defendants caused Nano-X to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Nano-X securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

65. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

66.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Nano-X securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Nano-X securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

67.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

68.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

# COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

69. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

71. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Nano-X securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Nano-X securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan

27

and course of conduct, Defendants, and each of them, took the actions set forth herein.

72. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Nano-X securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nano-X's finances and business prospects.

73. By virtue of their positions at Nano-X, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

74.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Nano-X, the Individual Defendants had knowledge of the details of Nano-X's internal affairs.

75.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nano-X.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nano-X's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nano-X securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Nano-X's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Nano-X securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

76.　During the Class Period, Nano-X securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nano-X securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Nano-X securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Nano-X securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

77.　By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.　As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during

the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

79. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80. During the Class Period, the Individual Defendants participated in the operation and management of Nano-X, and conducted and participated, directly and indirectly, in the conduct of Nano-X's business affairs. Because of their senior positions, they knew the adverse non-public information about Nano-X's Korean operations and manufacturing costs and related issues.

81. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nano-X's financial condition and results of operations, and to correct promptly any public statements issued by Nano-X which had become materially false or misleading.

82. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nano-X disseminated in the marketplace during the Class Period concerning Nano-X's results of operations.

31

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nano-X to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Nano-X within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nano-X securities.

83.    Each of the Individual Defendants, therefore, acted as a controlling person of Nano-X.  By reason of their senior management positions and/or being directors of Nano-X, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Nano-X to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Nano-X and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

84.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nano-X.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 12, 2026                    Respectfully submitted,

POMERANTZ LLP

*/s/ Brian Calandra*
Brian Calandra
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

33

*Attorneys for Plaintiff*

*\*Pro hac vice* applications forthcoming

34

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, _Katlyn Steele_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Nano-X Imaging Ltd. ("Nano-X") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Nano-X securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Nano-X securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Nano-X securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

Docusign Envelope ID: C0887DB1-236E-8DF3-814D-92D3B40C9B02

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed** ___5/19/2026_____
               **(Date)**

DocuSigned by:

_____
                3A4156D35B2F4EE...
               **(Signature)**

Katlyn Steele
_____
               **(Type or Print Name)**

**Nano-X Imaging Ltd. (NNOX)**                                                                                         **Katlyn Steele**

**List of Purchases/Acquisitions and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 7/21/2025 | 2,500 | $5.3000 |
| Purchase/Acquisition | 7/24/2025 | 3,000 | $5.3400 |
| Sale | 8/12/2025 | (2,500) | $4.8500 |
| Sale | 9/9/2025 | (500) | $4.0500 |
| Sale | 3/16/2026 | (1,000) | $2.5700 |